**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David "Lane" Frank,<br><br>    Plaintiff,<br><br>vs.<br><br>Certain Underwriters at Lloyds London Syndicate 4141,<br><br>    Defendant. | No. CV-10-00381-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendant's Motion for Summary Judgment. (Doc. 28.) Defendant seeks to defeat Plaintiff's breach of contract claim through judgment in Defendant's favor on its affirmative defense of proper rescission. Defendant also seeks judgment on Plaintiff's claim for bad faith, and to establish Plaintiff's inability to offer evidence warranting punitive damages. Having reviewed the arguments advanced in the parties' briefs and at oral argument, the Court will grant Defendant's motion in part.

**I.     Preliminary Matters: Frank's Rule 37(c) Argument**

The District of Arizona Local Rules require the party moving for summary judgment to submit a separate statement of facts. LRCiv 56.1(a). The Local Rules then require the opposing party to submit a separate statement admitting or denying the moving party's facts, and then specifying any additional facts necessary to resolve the motion. *Id*. 56.1(b). But the Local Rules do not permit the moving party to submit yet more facts in reply. *See*

*Allstate Ins. Co. v. Ford Motor Co.*, No. CV-08-2276-PHX-NVW, 2010 WL 1654145, at *10 (D. Ariz. Apr. 21, 2010) ("While LRCiv 56.1(d) permits the moving party to file a 'reply memorandum,' it does not permit an additional separate statement of facts.").

Here, Underwriters submitted new facts (and supporting documentary evidence) in reply. "Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond." *JG v. Douglas County Sch. Dist.*, 552 F.3d 786, 803 (9th Cir. 2008) (internal quotation marks removed; alterations incorporated). Thus, the Court had discretion to strike the new evidence, ignore it, or grant Frank an opportunity to surreply. The Court chose to permit a surreply. (*See* Doc. 49.)

Frank's surreply contains no argument about whether Underwriters' newly submitted evidence creates or resolves disputed issues of material fact. Frank instead argues that Underwriters had never before disclosed this evidence, and it should therefore be excluded under Fed. R. Civ. P. 37(c)(1), which states: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on the motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."

The Court chose not to permit further briefing on this issue (*see* Doc. 55) because it concluded that Underwriters' new evidence was relevant and should be allowed into the record, even if untimely disclosed (as alleged by Frank). The Court gave Frank an opportunity to surreply specifically to avoid the supposed prejudice to Frank. Nonetheless, the Court has also determined that Underwriters can prevail without its new evidence. Accordingly, although the Court considers the new evidence as part of the record, the Court will not consider it in the analysis below.

**II. Summary Judgment Standard**

Summary judgment is warranted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying those portions of the

1 pleadings, depositions, answers to interrogatories, and admissions on file, together with the
2 affidavits, if any, which it believes demonstrate the absence of any genuine issue of material
3 fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party would
4 bear the burden of persuasion at trial, the moving party may carry its initial burden of
5 production by producing "evidence negating an essential element of the nonmoving party's
6 case," or by showing, "after suitable discovery," that the "nonmoving party does not have
7 enough evidence of an essential element of its claim or defense to carry its ultimate burden
8 of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d
9 1099, 1105–06 (9th Cir. 2000).

10 When the moving party has carried its burden, the nonmoving party must respond
11 with specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(c)(1). But
12 allegedly disputed facts must be material — the existence of only "*some* alleged factual
13 dispute between the parties will not defeat an otherwise properly supported motion for
14 summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)
15 (emphasis in original).

16 Where the record, taken as a whole, could not lead a rational trier of fact to find for
17 the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita Elec.*
18 *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, the nonmoving
19 party's properly presented evidence is presumed to be true and all inferences from the
20 evidence are drawn in the light most favorable to that party. *Eisenberg v. Ins. Co. of N. Am.*,
21 815 F.2d 1285, 1289 (9th Cir. 1987).

22 **III. Facts**

23 The following facts are not disputed, unless attributed to one party or the other.

24 **A. Background on the Dispute**

25 Plaintiff David "Lane" Frank is an Arizona resident. From 2006 through sometime
26 in 2009, he lived primarily in Rocky Point (Puerto Peñasco), Mexico, working as a
27 subcontractor. In early 2008, while in Mexico, Frank decided he should buy health
28 insurance. He contacted an insurance agent, who provided Frank with an application for

1 international health insurance through Defendant ("Underwriters").  Frank read and understood the application and completed it himself without assistance.

2 At one point, the application asked, "Within the last ten years, have you had any indication, signs, symptoms, diagnosis or treatment of any disease or disorder of . . . [j]oints or spine?"  Frank checked the "yes" box.  Later in the application, he elaborated that he had a herniated lumbar disc in 2003, for which he had surgery, and a knee injury in 2005, for which he also had surgery.

3 The application also asked, "Within the last ten years, have you had any indication, signs, symptoms, diagnosis or treatment of . . . high blood pressure?"  To this, Frank checked the "yes" box.  When asked this same question with respect to arthritis, however, Frank checked the "no" box.  Frank also checked the "no" box when asked, "Within the last ten years, have you had any indication, signs, symptoms, diagnosis or treatment of any disease, disorder or abnormality of the . . . [h]eart or circulatory system?"

4 Frank then submitted his application, dated February 1, 2008.  On the application, Frank listed his Rocky Point address as his residence but provided a post office box in Lukeville, Arizona, as his mailing address.  Lukeville is the Arizona border town closest to Rocky Point.

5 Underwriters reviewed Frank's application and requested additional information about his disclosed conditions.  Frank then clarified, among other things, that his 2005 knee injury involved his left knee.  Frank submitted his clarifications on February 16, 2008, along with a signed authorization permitting Underwriters to obtain Frank's medical records.  Underwriters did not investigate Frank's conditions further, and issued him a health insurance contract effective March 11, 2008 through March 11, 2009 (which was subsequently renewed through March 11, 2010).

6 Underwriters attached three riders to Frank's policy.  The first rider excluded coverage for his lumbar disc problem for 36 months; the second rider excluded coverage for his left knee problem for 24 months; and the third rider excluded coverage for high blood pressure for 12 months.

- 4 -

1    In early 2009, Frank began receiving treatment for symptoms in his right knee.
2 Frank's doctor recommended arthroscopic surgery, which took place in March 2009. Frank
3 claims that, before the surgery, Underwriters assured him that his policy would cover the
4 procedure (although the policy states, "The fact that expenses are Pre-certified does not
5 guarantee [benefits]").

6    As part of the claims process after that surgery, Frank explained its necessity as
7 follows:

> The condition began approximately five years ago. Both my knees were warring [*sic*] out due to many years of hard construction work, sports when young, hiking and being active, etc.
>
> Over the years they got worse and worse as the cartilage wore away, and they began to rub bone on bone.

This information prompted Underwriters to begin what it calls a "rescission review." A compliance manager, John Padgett, reviewed certain medical records, Frank's statements, and Frank's original insurance application materials to determine whether Underwriters had erroneously issued Frank's policy.

While this review was ongoing (about which Frank apparently knew nothing), a therapist injured Frank's recently-operated-upon right knee, requiring a second surgery. Frank claims that Underwriters again assured him that the policy would cover the second surgery, which took place in May 2009.

In early August 2009, Frank received a letter from Underwriters, signed by Padgett, canceling Frank's insurance policy. According to the letter, Underwriters had

> been provided with information concerning your medical history that is not consistent with the information you provided on your Application for Insurance dated February 1, 2008. Specifically, we have received copies of your medical records from North Phoenix Orthopedic and John C[.] Lincoln Health Network.
>
> If this information had been disclosed on your Application for Insurance, coverage would not have been provided to you. Consequently, in accordance with CONDITIONS

> PRECEDENT, B., of the [insurance agreement, providing that misstatements in the application may void the policy], please be advised that your insurance is null and void and all claims forfeited. Your individual medical premium of $5,682.00 will be refunded within 10 days.
>
> We encourage you to obtain a complete copy of your medical records from North Phoenix Orthopedic and John C[.] Lincoln Health Network . . . . If you believe the medical records contain errors, you should request that the doctors correct their records and forward the corrected copies to us for review, along with an explanation for all changes.

Padgett did not attach any records from North Phoenix Orthopedic or John C. Lincoln Health Network to his August 2009 letter, nor did he explain in any detail why the information in these records would have led Underwriters to deny insurance in the first place. In support of summary judgment, however, Padgett submitted an affidavit to which he attached a letter dated February 10, 2008 (approximately the same time that Frank applied for health insurance) from a doctor at North Phoenix Orthopedic to another doctor. The letter states that Frank

> has been complaining [for] 8 years of increasing right knee pain. It has gotten particularly symptomatic over the past few months. He is working construction in Rocky Point and has found the work aggravating. He says the knee aches and burns at night, during and after activity. . . .
>
> * * *
>
> . . . he has failed prior conservative treatments with cortisone injections, Synvisc injections and he is having constant pain, so for pain relief, I do recommend right total knee arthroplasty [*i.e.*, surgical reconstruction or replacement of the joint].

Padgett also attached to his affidavit a form that Frank apparently filled out for North Phoenix Orthopedic, in which he put an X in the "yes" box next to a question asking him if he had a history of arthritis.

Padgett's summary judgment affidavit also includes records from John C. Lincoln Health Network. Specifically, the affidavit includes the record of a doctor consultation while

- 6 -

Frank was in the hospital recovering from his March 2009 surgery on his right knee. Apparently Frank's knee surgeons noticed heart rhythm irregularities during and after the surgery. A cardiologist therefore met with Frank about the issue and recorded that Frank has

> a history of paroxysmal atrial arrhythmias which presumably are atrial fibrillation, although it sounds like he has never really been officially diagnosed with that. . . .
>
> The patient states that he is aware of his arrhythmias frequently, dating back approximately 7 or 8 years ago. He does not get these episodes very often, but he can feel them any time they do occur. He gets a funny feeling in his chest. He does not really have pain or shortness of breath. He gets a little winded when it happens . . . .

Padgett says that he relied on these records to conclude that Frank had three additional medical conditions which Frank should have disclosed in his insurance application: right knee problems, arrhythmia, and arthritis. Had Frank disclosed those three conditions, Padgett says that Underwriters would have added three additional riders to the three already placed on Frank's policy. However, according to Padgett, Underwriters' underwriting guidelines allow a total of five riders on Frank's type of policy, and six riders therefore made Frank ineligible for insurance.[1]

---

[1] Frank does not contradict this claim, but argues that it is not supported by competent evidence. Frank believes that Padgett's affidavit is "conclusory," points out that Underwriters does not attach any underwriting guidelines documents, and that Padgett is not a member of the underwriting department. (Underwriters submitted material to rebut these accusations in its reply in support of summary judgment — the material the Court has not considered for purposes of this motion. *See supra* p. 2.) However, Padgett states in his affidavit that he is familiar with the relevant underwriting guidelines, and Frank offers no reason to doubt this. Nor does Frank argue that Padgett is a newly disclosed witness, from (or about) whom he could not obtain discovery. To the extent Frank feels ambushed by Padgett's affidavit, Frank can only blame himself. It should have been evident from the beginning of the case that the August 2009 rescission letter, signed by Padgett, is an especially important document. Frank's apparent failure to conduct adequate discovery about the letter and the person who wrote it does not convert Padgett's affidavit into an ambush.

- 7 -

As noted above, Padgett's August 2009 rescission letter did not contain any of this detail, nor did Frank accept Padgett's invitation to "obtain a complete copy of your medical records from North Phoenix Orthopedic and John C[.] Lincoln Health Network," "request that the doctors correct their records [if they have errors]," and then "forward the corrected copies to [Underwriters] for review." Frank claims that he instead called Underwriters three times in the weeks following the letter, asking for additional explanation, but he never received one.

### B. Frank's Deposition

Frank filed suit against Underwriters in January 2010 in Maricopa County Superior Court, and Underwriters removed to this Court the following month, alleging diversity jurisdiction. At Frank's ensuing deposition, counsel for Underwriters questioned Frank extensively about his arthritis, arrhythmia, and right knee problems. Regarding the North Phoenix Orthopedic form on which Frank had checked "yes" for a history of arthritis, Frank explained that it was an assumption, not a diagnosis. Frank had continuing back pain after his 2003 lumbar surgery and he attributed that pain to arthritis because general discussions with his doctors — discussions which took place before Frank applied for insurance — led him to believe that arthritis often followed from back surgeries. When asked by Underwriters' counsel, "So if you had those discussions about potential arthritic changes prior to the date of the [insurance] application . . . why not check off 'Yes' for 'Arthritis' like you did a year later [on the North Phoenix Orthopedic form]?", Frank responded, "I don't know. Oversight." Frank, however, has never been formally diagnosed with arthritis.

Concerning the John C. Lincoln cardiologist's statement that Frank was "aware of his arrhythmias frequently, dating back approximately 7 or 8 years ago," Frank explained that he did not suspect arrhythmia as such before he applied for insurance. When the cardiologist diagnosed Frank with arrhythmia, however, Frank told the cardiologist that he had previously experienced symptoms of heavy heartbeat and unusual windedness after exertion. Based on this, Frank and the cardiologist concluded together that Frank had been experiencing arrhythmia for several years.

- 8 -

Finally, regarding the February 2008 North Phoenix Orthopedic letter describing Frank's right knee condition, Frank had little to say other than to acknowledge that the doctor who treated his left knee in 2005 had also x-rayed the right knee, and that doctor had spoken with him about cartilage deterioration in his right knee and the potential need for surgery there in the future. But Frank also asserted that he "wasn't really having issues with [his] right knee" at the time he applied for insurance, "other than maybe some soreness . . . after a long hike or whatever . . . ."

**IV.    Analysis**

  **A.    Proper Rescission Generally**

Underwriters first seeks summary judgment on its defense of proper rescission. Underwriters concedes that it carries the burden of establishing this defense but argues that Frank can present no facts through which a reasonable jury could reject Underwriters' defense. At the outset, however, there exists a dispute over the proper rescission standard. Underwriters claims that an Arizona insurance statute provides the proper standard:

> Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under [an insurance] policy unless:
>
> 1. Fraudulent.
>
> 2. Material either to the acceptance of the risk, or to the hazard assumed by the insurer.
>
> 3. The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer and required either by the application for the policy or otherwise.

A.R.S. § 20-1109.

Frank points out, however, that this statute "shall not apply to . . . [p]olicies or contracts not issued for delivery in this state nor delivered in this state . . . ." *Id*. § 20-1101(2). Frank claims "it is undisputed that [his] policy was issued and delivered in Puerto

- 9 -

1  Penasco, Mexico." (Doc. 35 at 8.) Therefore, says Frank, the Arizona common law rule
2  applies: "an insurance company can rescind a policy if the insured makes misrepresentations
3  and the misrepresentations are material to the risk insured." *CenTrust Mortgage Corp. v.
4  PMI Mortgage Ins. Co.*, 166 Ariz. 50, 55, 800 P.2d 37, 42 (Ct. App. 1990).

5  This dispute appears to turn on what "delivery" means. The Court could find no
6  Arizona authority defining "delivery," but cases addressing the issue imply that it
7  traditionally happens through physical delivery of the policy documents to the insured. *See
8  Acacia Mutual Life Ass'n v. Berry*, 54 Ariz. 208, 216–17, 94 P.2d 770, 773–74 (1939)
9  (discussing whether "delivery," discussed in the physical sense, is an absolute prerequisite
10 to policy effectiveness); *see also* 1A *Couch on Insurance* § 14:6 n.1 (3d ed. 1995) ("Delivery
11 of a policy may be defined as the act of the insurer of placing a policy in the control of the
12 insured or someone on his or her behalf or of holding the policy for him or her subject to his
13 or her direction."). Here, the evidence does not show exactly where Frank obtained physical
14 possession of the insurance documents. It appears undisputed that Frank applied for
15 insurance while living in Mexico, that he wanted the insurance to cover him while in Mexico,
16 and that the policy which eventually issued would provide coverage in Mexico. In addition,
17 the insurance policy itself lists Frank's Rocky Point address as his "residence." But it also
18 lists a post office box in Lukeville, Arizona, as Frank's mailing address. Thus, although both
19 parties probably understood that the policy might be invoked in Mexico most frequently,
20 physical "delivery" of the policy documents may have happened in Arizona.

21 These uncertainties prevent the Court from deciding whether statute or common law
22 applies. Even if the record conclusively established that "delivery" happened in Lukeville,
23 Arizona, the Court would still face the question of whether "delivery" to an American
24 border-town post office box, likely acquired for convenience only, counts as "delivery" or
25 "issued for delivery" in Arizona.

26 Given the gaps in the record, the Court has analyzed Underwriters' case under both
27 the statutory and common law tests. As explained below, the Court has concluded that both
28 tests reach substantially the same result.

- 10 -

1  **B.     Proper Rescission Under the Statutory Test**

2 Under the statutory test, Underwriters can prevail at summary judgement by
3 demonstrating a lack of a genuine, material dispute that: (1) Frank's insurance application
4 was (1) "[f]raudulent"; (2) the fraud was "[m]aterial"; and (3) had Underwriters known the
5 "true facts," Underwriters "in good faith" would "not have issued the policy, or would not
6 have issued a policy in as large an amount, or would not have provided coverage with respect
7 to the hazard resulting in the loss." A.R.S. § 20-1109. The Court will discuss each element
8 in turn, as applied to arthritis, arrhythmia, and right knee problems.

9  **1.     First Element: Fraud**

10 The fraud element in A.R.S. § 20-1109 may be satisfied through "actual" or "legal"
11 fraud on the insurance application. *Smith v. Republic Nat'l Life Ins. Co.*, 107 Ariz. 112, 115,
12 483 P.2d 527, 530 (1971). Actual fraud requires subjective intent to deceive, and is the
13 appropriate test when the question at issue on the insurance application calls for an opinion;
14 legal fraud does not require intent to deceive, and is the appropriate test when the question
15 calls for facts. *Valley Farms, Ltd. v. Transcontinental Ins. Co.*, 206 Ariz. 349, 353, 78 P.3d
16 1070, 1074 (Ct. App. 2003). Neither Underwriters nor Frank presents any clear argument
17 about whether actual or legal fraud applies, but the analysis below shows that both tests
18 require consideration.

19 The only "element" of actual fraud the Court must consider here is whether Frank
20 intended to deceive Underwriters with his answers. Legal fraud, however, requires the Court
21 to consider three elements: (1) whether the question on the insurance application "is one
22 where the facts are presumably within the personal knowledge of the insured"; (2) whether
23 those facts "are such that the insurer would naturally have contemplated that the [applicant's]
24 answers represented the actual facts"; and (3) whether the answers are false. *Id.* While
25 phrased as a three-part test, in practice the second part is either ignored or analyzed
26 indistinguishably from the first. *See*, *e.g.*, *Mutual Life Ins. Co. v. Morairty*, 178 F.2d 470,
27 473–74 (9th Cir. 1950); *Mann v. N.Y. Life Ins. and Annuity Corp.*, 222 F. Supp. 2d 1151,
28 1154–55 (D. Ariz. 2002); *Equitable Life Assur. Soc'y v. Anderson*, 151 Ariz. 355, 357–58,

- 11 -

727 P.2d 1066, 1068–69 (Ct. App. 1986); *Continental Cas. Co. v. Mulligan*, 10 Ariz. App. 491, 493, 460 P.2d 27, 29 (1969). The Court will therefore treat part two as automatically satisfied if part one is satisfied.

Frank's arrhythmia immediately raises the question of fact vs. opinion, and therefore whether actual or legal fraud applies. Frank was asked, "Within the last ten years, have you had any indication, signs, symptoms, diagnosis or treatment of any disease, disorder or abnormality of the . . . [h]eart or circulatory system?" This question seems to call for a fact when it asks about a "diagnosis or treatment," and the legal fraud standard applies. But it is undisputed that Frank had received no arrhythmia diagnosis or treatment until a year after he applied for insurance. Therefore, Underwriters fails on the third part of the legal fraud test — falsity — with respect to the "diagnosis or treatment" portion of this question.

Concerning the rest of the question — "indications, signs, symptoms" — courts have generally treated questions about "symptoms" as calling for an opinion, rather than a fact. *Golden Rule Ins. Co. v. Montgomery*, 435 F. Supp. 2d 980, 993 (D. Ariz. 2006) ("Not every 'symptom' that a person experiences relates to an underlying medical condition or disorder. What constitutes a 'symptom' at all, or at what point a particular individual might characterize his body's afflictions as amounting to a medical 'condition' is highly subjective . . . ." (citation omitted)); *Stewart v. Mutual of Omaha Ins. Co.*, 169 Ariz. 99, 105, 817 P.2d 44, 50 (Ct. App. 1991) ("What constitutes a 'symptom' . . . is highly subjective . . . and is often more akin to an opinion than to fact."). The Court agrees with this authority and concludes that the portion of Underwriters' question asking about "indications, signs, [or] symptoms" calls for an opinion. Underwriters must therefore establish actual fraud, including Frank's subjective intent to deceive Underwriters.

Frank did not know he had arrhythmia until a year after his insurance application. All he knew is that exertion led to heavy heartbeat and unusual windedness — signs that most people attribute to being out of shape as much heart problems. Thus, a reasonable jury could conclude that Frank did not intend to deceive Underwriters through his answer to the heart conditions question. A genuine dispute of material fact therefore remains, and summary

1  judgment is not appropriate on the arrhythmia issue.

2  Concerning Frank's arthritis, the Court again finds that the application question at 3 issue asks for both fact and opinion: "Within the last ten years, have you had any indication, 4 signs, symptoms, diagnosis or treatment of . . . arthritis?" The "diagnosis or treatment" 5 portion of this question asks for a fact, but as far as this Court has been informed, Frank has 6 never been diagnosed with or treated for arthritis. Therefore, Underwriters cannot establish 7 the falsity element of the legal fraud test. As for the actual fraud test, required by the 8 "indication, signs, [or] symptoms" portion of this question, the Court again finds a genuine 9 dispute of material fact. Frank indisputably experienced lower back pain before he applied 10 for insurance, but his later assumption that such pain resulted from arthritis does not 11 necessarily mean that he intended to deceive Underwriters by checking "no" to arthritis on 12 his insurance application. Accordingly, summary judgment is not appropriate on the arthritis 13 issue.

14 Finally, regarding Frank's right knee problems, the Court again sees the application 15 question at issue as asking for both fact and opinion: "Within the last ten years, have you had 16 any indication, signs, symptoms, diagnosis or treatment of any disease or disorder of . . . 17 [j]oints or spine?" Here, however, the Court need not address actual fraud because 18 Underwriters has established a lack of genuine dispute over the elements of legal fraud as 19 applied to the "diagnosis" portion of this question. In 2005, the doctor who treated Frank for 20 his left knee had x-rayed Frank's right knee and diagnosed him with loss of cartilage in that 21 knee, potentially requiring surgery in the future. These were facts presumably within Frank's 22 personal knowledge at the time he applied for insurance in 2008, and his answer was false. 23 Indeed, when explaining why he needed the surgery, Frank admitted that "[t]he condition 24 began approximately five years ago" — well before he applied for insurance. Summary 25 judgment is therefore appropriate on the fraud element of the statutory analysis, at least with 26 respect to Frank's right knee condition.

1

### 2.   Second Element: Materiality

2 Under the statutory test, the legal fraud created by not disclosing the right knee
3 condition must also be "[m]aterial either to the acceptance of the risk, or to the hazard
4 assumed by the insurer." A.R.S. § 20-1109(2). "The test of materiality is whether the facts,
5 if truly stated, might have influenced a reasonable insurer in deciding whether to accept or
6 reject the risk." *Valley Farms*, 206 Ariz. at 353, 78 P.3d at 1074 (Ct. App. 2003) (internal
7 quotation marks omitted).

8 There is no genuine dispute over this element. Underwriters knew that Frank had
9 surgery on his left knee, and appended a rider to Frank's policy restricting coverage on his
10 left knee. Had Underwriters known that Frank's right knee exhibited the same condition that
11 led to surgery in his left knee, Underwriters would have been reasonably influenced their
12 decision whether to accept or reject Frank's application. Summary judgment is therefore
13 appropriate on the materiality element of the statutory analysis.

14

### 3.   Third Element: Good Faith Denial or Modification

15 In addition to fraud and materiality, Underwriters must also establish that "in good
16 faith [it] would either not have issued the policy, or would not have issued a policy in as large
17 an amount, or would not have provided coverage with respect to the hazard resulting in the
18 loss, if the true facts had been made known." A.R.S. § 20-1109(3). There is no genuine
19 dispute that Underwriters "would not have provided coverage with respect to the [right
20 knee]" had it known the "true facts." Underwriters' affidavit from Padgett states that
21 Underwriters would have appended a rider for the right knee, had it known about Frank's
22 condition there. Frank raises no genuine dispute to Padgett's testimony. Summary judgment
23 is therefore appropriate on the good faith denial or modification element of the statutory
24 analysis.

25

### C.   Proper Rescission Under the Common Law Test

26 As discussed above, Frank claims that the statutory analysis does not apply, but rather
27 the common law test, where "an insurance company can rescind a policy if the insured makes
28 misrepresentations and the misrepresentations are material to the risk insured." *CenTrust*,

- 14 -

166 Ariz. at 55, 800 P.2d at 42.  The statutory analysis, however, essentially embodies the common law test (the main difference being the statute's third requirement of good faith denial or modification).  Thus, the preceding discussion of Frank's right knee condition shows that Frank misrepresented that condition on his application, and that the misrepresentation was material.  Accordingly, summary judgment in favor of Underwriters is appropriate under the common law rescission test.[2]

### D. The Result: Proper Rescission or Proper Claim Denial?

This Court's inability to determine whether the statutory or common law test controls creates some difficulty in deciding exactly what form of summary judgment to enter.  Under the common law test, Underwriters is entitled to summary judgment on their affirmative defense of proper rescission.  Under the statutory test, however, Underwriters has not established proper rescission *per se*, even though it has satisfied all three elements of the statute.  Underwriters argued that it properly rescinded because it would have added three additional riders to Frank's policy (for arrhythmia, arthritis, and right knee problems), in addition to the three already there, and the maximum allowed on that type of policy is five. But the Court's analysis above shows that summary judgment is appropriate only on the issue of Frank's right knee.  At this stage, then, it seems clear that Underwriters could have justifiably appended one more rider to Frank's policy, limiting coverage on his right knee, but it would not necessarily have refused to issue a policy altogether.  Underwriters would need to go to trial and establish actual fraud with respect to Frank's arthritis and arrhythmia before it could prevail on its proper rescission theory under the statutory test.

On the other hand, the economic damages at issue in this case are the costs of Frank's two surgeries on his right knee, and the analysis above at least entitles Underwriters to judgment on the question of whether it appropriately denied coverage on those surgeries. (*Compare* Doc. 8 ¶ 57 (asserting an affirmative defense that Frank breached the insurance

---

[2]The Court notes that the challenge Frank raises to Padgett's affidavit testimony about underwriting guidelines, *see supra* n.1 and accompanying text, becomes irrelevant under the common law test — the test for which Frank has argued.

- 15 -

policy which "may negate the obligation to make payments under various coverages under the policy").) At oral argument, counsel for Underwriters confirmed that, from a practical perspective, this may be substantially the same result as summary judgment on its rescission defense. The Court therefore determines that Underwriters is entitled to summary judgment on the issue of whether it properly denied Frank's claim for coverage. However, whether Underwriters properly rescinded the entire policy cannot be determined on this record.

### E. Bad Faith & Punitive Damages

Given the foregoing, Frank's bad faith claims and his request for punitive damages necessarily fail. Even if Underwriters went to trial (*e.g.*, to establish actual fraud under the statutory test with respect to arthritis and arrhythmia), the Court has already found that Underwriters appropriately took the action that caused Frank's claimed economic damages. Therefore, Underwriters did not breach its contract with Frank — a prerequisite for bad faith breach. And without bad faith breach, the Court cannot award punitive damages. Underwriters therefore deserves summary judgment on these issues.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc. 28) is GRANTED as to the questions of (a) whether Underwriters properly denied coverage for Frank's right knee surgeries, (b) whether Underwriters acted in bad faith, and (c) whether Underwriters can be liable for punitive damages, and DENIED in all other respects.

DATED this 10th day of May, 2011.

_____
Neil V. Wake
United States District Judge